Filed 6/27/25  P. v. Reed CA1/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIRST APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BYRON O.J. REED, JR.,<br><br>    Defendant and Appellant. | A164986<br><br>(Alameda County<br>Super. Ct. No. 20CR000062A)<br><br>ORDER MODIFYING OPINION |

BY THE COURT:

It is ordered that the opinion filed on June 25, 2025, be modified as follows:

At page 34, the third full paragraph is revised to read: "At the sentencing hearing, the court imposed an indeterminate term of 30-years-to-life for the second degree murder conviction (count 1) and a determinate three-year midterm sentence for the second degree robbery conviction (count 2) and related great bodily injury enhancement (§ 2022.7, subd. (a)) which the court ordered stayed pursuant to section 654.  The court struck the section 667, subdivision (a)(1) enhancement, stating: 'The five-year enhancement pursuant to 667 (a)(1) is stricken pursuant to section 1385 in the interest of justice.'  However, the sentencing minute order does not mention or reflect any action by the court on the five-year prior enhancement.  The sentencing

minute order also fails to mention the court's imposition and stay of punishment of the great bodily injury enhancement (§ 12022.7, subd. (a)).

At page 34, fourth full paragraph, second sentence is revised to read: "Thus, the sentencing minute order must be corrected to reflect the court: (1) struck the five-year enhancement (§ 667, subd. (a)(1)) pursuant to section 1385 in the interest of justice; and (2) imposed and stayed a three-year term for the great bodily injury enhancement (§ 12022.7, subd. (a), count 2) pursuant to section 654."

At page 35, second paragraph, fourth sentence is revised to read: "The clerk is further ordered to prepare an abstract of judgment on form CR-290 as to the second degree robbery conviction (§ 211, count 2) indicating the imposition of three-year midterm stayed pursuant to section 654, and as to the related great bodily injury enhancement (§ 12022.7, subd. (a)) indicating the imposition a three-year term stayed pursuant to section 654."

At page 35, third paragraph is revised to read: "The March 21, 2022 sentencing minute order is hereby ordered to reflect: (1) imposition of a three-year term stayed pursuant to section 654 on the great bodily injury enhancement (§ 12022.7, subd. (a)) as to the second degree robbery conviction (§ 211, count 2); (2) the five-year enhancement (§ 667, subd. (a)(1)) is stricken in the interest of justice (§ 1385); and (3) imposition of an $8,000 restitution fine (§ 1202.4) and a suspended parole revocation fine of $8,000 (§ 202.45) pending successful completion of parole."

At page 36, first paragraph, clause "(3)" is revised to read: "(3) prepare form CR-290 for the determinate sentence as follows: (a) a three-year midterm sentence, stayed pursuant to section 654, for the second degree robbery (§ 211) conviction (count 2) and (b) a three-year sentence, stayed

pursuant to section 654 for the great bodily injury enhancement (§ 12022.7, subd. (a));"

This modification does not change the judgment.


Dated:_____                           _____

Richman, Acting P.J.

Filed 6/25/25  P. v. Reed CA1/2 (unmodified opinion)

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>BYRON O.J. REED, JR.,<br><br>    Defendant and Appellant. | A164986<br><br>(Alameda County<br>Super. Ct. No. 20CR000062A) |

**INTRODUCTION**

Defendant Byron O.J. Reed, Jr. appeals after a jury convicted him of second degree murder (Pen. Code,[1] § 187, subd. (a)) and second degree robbery (§ 211), and found Reed personally inflicted great bodily injury in the commission of the robbery, and he was sentenced to 30 years to life in prison.

On appeal, Reed contends his convictions must be reversed on account of instructional error, ineffective assistance of counsel, and cumulative error. Reed also contends the court erred in failing to consider his age and traumatic childhood when it denied his *Romero*[2] motion to strike a prior robbery conviction.  Finally, Reed contends, and the Attorney General

_____

[1]All further undesignated statutory references are to the Penal Code.

[2] *People v. Superior Court (Romero)* (1996) 13 Cal.4th 497 (*Romero*).

1

concedes, that errors in the clerk's minutes and the abstract of judgment require correction. We agree that the clerical errors must be corrected, but otherwise affirm the judgment.

## BACKGROUND

### *The Charges*

In July 2021, the Alameda County District Attorney filed an information charging Reed and codefendant Kejuan Wiggins with murder (§ 187, subd. (a); count 1) and charging Reed, Wiggins, and Javon Lee with second degree robbery (§ 211; count 2). The information also alleged that Reed and Wiggins committed first degree felony murder (§ 189, subds. (e)(1) & (3)). As to the robbery count, the information alleged that Reed and Wiggins personally inflicted great bodily injury upon the victim (§ 12022.7, subd. (a)). The information further alleged that Reed had suffered a prior strike conviction (§§ 667, subds. (b)–(i), 1172.12, 211) and a prior serious felony conviction (§ 667, subd. (a)(1)) and committed the instant offenses while on parole (§ 1203.085, subds. (a)–(b)).[3]

### *Evidence at Trial*

#### *Events Prior to the Charged Offenses*

In late December 2019, Reed and Lee communicated on social media about a plan to break into vehicles and steal items. On December 29, Reed messaged Lee that he did not have a "bip," a slang term for a burglary tool used to smash car windows. On December 30, Reed messaged Lee that he was leaving to pick him up in Stockton.

---

[3] Lee and Wiggins are not parties to this appeal. Prior to trial, Lee pleaded guilty to robbery and admitted a prior strike allegation.

On the evening of December 30, Reed picked up Lee in Stockton, driving a black BMW sport utility vehicle that Reed's sister had rented. Lee spent the night in Oakland at the house Reed and his sister shared. Early the next morning, Lee messaged Wiggins and asked "U got yo bip," to which Wiggins replied, "Yee." Lee messaged Wiggins to "[b]e ready."

*The Robbery and Murder*

The next morning around 11:30 a.m., witnesses observed the black BMW stopped outside of a Starbucks coffee shop in Montclair Village; the vehicle was not in a parking spot and was blocking traffic. One eyewitness saw "a couple people get out and go in the Starbucks." Shortly thereafter the vehicle drove off and up the street only to return moments later. Wiggins, who had been in the vehicle, got out, went into the Starbucks, and grabbed a laptop from Mr. Zeng, an unsuspecting customer who was sitting in the coffee shop. Wiggins and Lee then ran back into the waiting SUV. Mr. Zeng chased after Wiggins shouting: " 'Don't take it!' " Wiggins jumped into the open rear passenger door and Mr. Zeng jumped in behind him. They struggled; Wiggins pushed against Mr. Zeng with his feet and legs, kicking him while Mr. Zeng was halfway inside the vehicle.

A few seconds after Mr. Zeng jumped into the vehicle, witnesses testified that it "started to speed away" up the hill with Mr. Zeng's legs hanging out of the open rear passenger door. After the vehicle sped past three or four cars, Mr. Zeng was ejected and appeared to hit a parked car. An Oakland firefighter who happened to be nearby testified that "within seconds" of the vehicle accelerating up the hill, he heard a loud crash like a heavy object hitting metal. He ran to the corner and saw a body on the ground about 40 feet away. He saw the vehicle continue to the top of the hill before it disappeared from sight.

3

*Surveillance Footage*

Surveillance cameras located outside and within Starbucks captured the events surrounding the robbery.

Surveillance footage taken inside Starbucks showed two individuals entering Starbucks; one held the front door of the Starbucks open while the other quickly grabbed Mr. Zeng's laptop and ran out the front door. Mr. Zeng immediately followed in pursuit.

An audiovisual specialist from the district attorney's office was able to slow down and zoom in on portions of the surveillance footage. The zoomed-in footage from outside Starbucks showed the vehicle slightly wobble as Mr. Zeng was hurled from it.

Oakland Police Officer Gerald Moriarty reviewed the surveillance footage. He identified Lee as the individual holding the door open at Starbucks and Wiggins as the individual who took Mr. Zeng's laptop.

All of the surveillance footage was played for the jury and admitted into evidence.

*Autopsy*

Dr. John Iocco, a forensic pathologist, performed an autopsy in this case. He testified that the autopsy showed Mr. Zeng had sustained abrasions on his legs and abdomen, right hand, left arm and shoulder, and face. Mr. Zeng suffered a depressed skull fracture that indicated he had made forceful contact with a hard surface; the fall from the vehicle was sufficient to break his skull. The cause of death was "multiple blunt head trauma," with "multiple" meaning "[m]any, many injuries. It could have been one event that . . . caused many fractures and hemorrhages, but there were many traumatic injuries." Dr. Iocco testified that Mr. Zeng's injuries were consistent with being ejected from a fast-moving vehicle.

Photographs of the autopsy, including a thigh injury, were shown to the jury and admitted into evidence.

### *Jury Verdict*

On November 9, 2021, the jury found both Reed and Wiggins not guilty of felony murder. The jury found Reed guilty of second degree murder, but could not reach a verdict for Wiggins as to the murder count. The jury found both Reed and Wiggins guilty of second degree robbery and found true the related great bodily injury allegation as to both defendants. That same day, Reed admitted the prior strike and prior serious felony conviction allegations.[4]

### *Sentencing*

On March 21, 2022, the court denied Reed's *Romero* motion to strike his prior strike conviction as to the murder count but granted it as to the robbery count. The court sentenced Reed to 30 years to life in prison (15 years to life, doubled for the strike prior). The court struck the prior serious felony conviction enhancement and imposed but stayed punishment for the robbery count and attendant great bodily injury enhancement.

## DISCUSSION

Reed contends legal errors by the trial court and ineffective assistance rendered by his trial counsel, whether considered individually or cumulatively, support reversal of his second degree murder and robbery convictions. He further contends the court abused its discretion in failing to consider his age and traumatic childhood in denying his *Romero* motion. Finally, Reed asserts, and the Attorney General concedes, there were errors

---

[4] Following the verdict, Wiggins pleaded guilty to voluntary manslaughter in exchange for dismissal of the second degree murder charge and 12 years in prison.

5

in the clerk's sentencing minute order and in the abstract of judgment that require correction.

## I. Jury Instructions

Reed argues the trial court erred in failing to instruct the jury that implied malice murder requires a " 'high degree of probability' " that a defendant's act " 'will result in death.' "  Reed further contends the trial court erred in failing to instruct the jury, sua sponte, that it must consider a defendant's youth in determining whether he acted with conscious disregard for human life as required for implied malice murder.

### A.    *Applicable Law and Standard of Review*

In criminal cases, trial courts have a duty to instruct the jury on the general principles of law relevant to the issues raised by the evidence. (*People v. Estrada* (1995) 11 Cal.4th 568, 574 (*Estrada*); accord, *People v. Thomas* (2023) 14 Cal.5th 327, 385.)  "The 'general principles of law governing the case' are those principles connected with the evidence and which are necessary for the jury's understanding of the case.  [Citations.]  As to pertinent matters falling outside the definition of a 'general principle of law governing the case,' it is 'defendant's obligation to request any clarifying or amplifying instruction.' "  (*Estrada*, at p. 574.)  The " 'language of a statute defining a crime or defense is generally an appropriate and desirable basis for an instruction, and is ordinarily sufficient when the defendant fails to request amplification.  If the jury would have no difficulty in understanding the statute without guidance, the court need do no more than instruct in statutory language.' "  (*Ibid.*; accord, *People v. Ramirez* (2021) 10 Cal.5th 983, 1001.)

Second degree murder is "the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness,

6

premeditation, and deliberation, that would support a conviction of first degree murder." (*People v. Knoller* (2007) 41 Cal.4th 139, 151 (*Knoller*).) "Malice may be either express, i.e. when a defendant manifests an intention to kill, or implied." (*People v. Clements* (2022) 75 Cal.App.5th 276, 299 (*Clements*).) Implied malice is statutorily defined in relevant part as "when the circumstances attending the killing show an abandoned and malignant heart." (§ 188, subd. (a)(2).) "Section 188's 'abandoned and malignant heart' language is of little assistance in defining the concept of implied malice, so it requires judicial interpretation." (*People v. Soto* (2018) 4 Cal.5th 968, 974.)

However, " '[a] trial court has no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel [citation], and failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal.' " (*People v. Jackson* (2016) 1 Cal.5th 269, 336.)

"We review a claim of instructional error de novo." (*People v. Thomas*, *supra*, 14 Cal.5th at p. 382; see *People v. Myles* (2023) 89 Cal.App.5th 711, 728.)

**B.** ***The Trial Court Properly Instructed the Jury on Implied Malice***

Reed contends that after his trial, the California Supreme Court in *People v. Reyes* (2023) 14 Cal.5th 981 (*Reyes*) clarified the definition of implied malice. He contends that since his jury was not instructed on this "necessary element of implied malice murder," his second degree murder conviction must be reversed. We are not persuaded.

At Reed's trial, the jury was instructed on implied malice using the then-current version of CALCRIM No. 520: The defendant acted with "*implied malice* if: [¶] 1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life;

7

[¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life." Element two recites the "objective component" of implied malice—an act that is dangerous to human life. Elements three and four recite the "subjective component"—the defendant's awareness of and disregard for the danger. (See *Clements*, *supra*, 75 Cal.App.5th at p. 299.)

In *Knoller*, *supra*, 41 Cal.4th at page 152, the California Supreme Court acknowledged two lines of appellate opinions that delineate the objective and subjective components of implied malice. The first derives from Justice Traynor's concurring opinion in *People v. Thomas* (1953) 41 Cal.2d 470, 480 (*Thomas*), which said malice is implied when " 'the defendant for a base, antisocial motive and with wanton disregard for human life, does an act that involves a high degree of probability that it will result in death.' " (*Knoller*, at p. 152.) The second line derives from *People v. Phillips* (1966) 64 Cal.2d 574 (*Phillips*),[5] where the court stated, malice is implied when the killing is proximately caused by " 'an act, the natural consequences of which are dangerous to life, which act was deliberately performed by a person who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*Id.* at p. 587.)

Our Supreme Court has repeatedly explained that the *Thomas* test and *Phillips* test articulate the same standard. (*Knoller*, *supra*, 41 Cal.4th at p. 152; *People v. Nieto Benitez* (1992) 4 Cal.4th 91, 104 (*Nieto Benitez*); *People v. Dellinger* (1989) 49 Cal.3d 1212, 1219–1222 (*Dellinger*).) However, the court declared a preference for the *Phillips* test in *Dellinger*: "The better practice in

_____

[5] *Phillips* was overruled on another ground in *People v. Flood* (1998) 18 Cal.4th 470, 490, fn. 12.

8

the future is to charge juries solely in the straightforward language of the 'conscious disregard for human life' definition of implied malice," the definition articulated in the *Phillips* test. (*Dellinger*, at p. 1221.) As our Supreme Court observed in *Knoller*, "The standard jury instructions thereafter did so. (See CALJIC No. 8.11; CALCRIM No. 520.)" (*Knoller*, at p. 152.)

Three years after *Dellinger*, the high court in *Nieto Benitez* reiterated that both tests articulated the same standard. (*Nieto Benitez*, *supra*, 4 Cal.4th at pp. 104, 111.) The court specifically rejected the argument that the trial court had a sua sponte duty to modify the form jury instruction on implied malice to include the " 'high probability' " language contained in the *Thomas* test. (*Id.* at p. 111.) This was because "the two linguistic formulations—'an act, the natural consequences of which are dangerous to life' and 'an act [committed] with a high probability that it will result in death' are equivalent and are intended to embody the same standard." (*Ibid.*)

Contrary to Reed's contention, *Reyes* did not announce a new "necessary element of implied malice murder." Rather, *Reyes* refined the objective component of implied malice. In doing so, the California Supreme Court reiterated its long-standing precedent that the *Phillips* and *Thomas* tests articulate the *same* standard. (*Knoller, supra*, 41 Cal.4th at p. 152; *Nieto Benitez, supra*, 4 Cal.4th at p. 104; *Dellinger, supra*, 49 Cal.3d at pp. 1219–1222.) Had the court intended to overturn this precedent and take a new position that these two tests articulate different standards, with the *Phillips* test being the broader one, it would have expressly so stated. Indeed, when *Reyes* cites the " ' "high degree of probability" ' " language it cites to the same page in *Knoller* where the court acknowledged that " 'dangerous to human life' " means the same thing as " ' "high degree of

9

probability" ' " of death. (*Reyes*, *supra*, 14 Cal.5th at p. 989, citing *Knoller*, *supra*, at p. 152.) For the *Reyes* court to include this citation without disavowing it is inconsistent with the notion that the court intended to break from its precedent.

Analyzing the context in which the *Reyes* court discussed the implied malice standard further confirms the court did not intend to articulate a different standard. *Reyes* involved an appeal from the denial of a section 1172.6 petition for resentencing. (*Reyes*, *supra*, 14 Cal.5th at p. 984.) The court's analysis was focused on applying established legal principles to the facts of that case. (See *id.* at p. 988.) The issue was not whether the jury instruction on implied malice was in error or whether the trial court applied the correct standard on implied malice in ruling on the section 1172.6 petition. Indeed, the court did not conclude that the trial court or the appellate court had applied an incorrect standard on implied malice in addressing the section 1172.6 petition; it concluded only that the facts were insufficient to meet the existing standard. (See *Reyes*, at pp. 988–989.) It is axiomatic that "[a]n opinion is not authority for a point not raised, considered, or resolved therein." (*Styne v. Stevens* (2001) 26 Cal.4th 42, 57.)

Finally, we are not persuaded by Reed's argument that in 2024 (post-*Reyes*) CALCRIM No. 520 was revised to incorporate the "high degree of probability" language. (See CALCRIM No. 520 (March 2024 rev.).)[6] That CALCRIM No. 520 was modified after *Reyes* is not dispositive because "jury

---

[6] Revised CALCRIM No. 520 provides: "1. He intentionally committed the act; [¶] 2. The natural and probable consequences of the act were dangerous to human life *in that the act involved a high degree of probability that it would result in death*; [¶] 3. At the time he acted, he knew his act was dangerous to human life; [¶] AND [¶] 4. He deliberately acted with conscious disregard for human life." (Italics added.)

instructions, whether published or not, are not themselves the law, and are not authority to establish legal propositions or precedent. They should not be cited as authority for legal principles." (*People v. Morales* (2001) 25 Cal.4th 34, 48, fn. 7.)

Accordingly, we conclude the trial court properly instructed the jury on implied malice.

## C. *The Trial Court Did Not Have a Sua Sponte Duty to Instruct the Jury to Consider Reed's Age in Determining Whether Reed Acted With Conscious Disregard For Human Life*

Reed was 22 years old at the time of the crimes charged in this case. He argues the trial court erred by failing to instruct the jury sua sponte to consider his youth as a factor in determining whether he acted with conscious disregard for human life as required for implied malice murder, and that this error violated his Fourteenth Amendment rights to due process and a fair trial. Because Reed did not object to CALCRIM No. 520 as given by the trial court, he forfeited his claim the instruction was erroneous because it did not require the jury to consider his youth in determining whether he acted with conscious disregard for human life. (See *People v. Lee* (2011) 51 Cal.4th 620, 638 ["no sua sponte duty to revise or improve upon an accurate statement of law without a request from counsel . . .; failure to request clarification of an otherwise correct instruction forfeits the claim of error for purposes of appeal"].) But even if Reed had not forfeited the argument, it lacks merit.

### 1. *Additional Background*

At trial, Wiggins's attorney elicited evidence of the confederates' ages on the day of the crimes from Officer Moriarty: Reed was 22 years old, Lee was 21, and Wiggins was 18.

11

During the jury instructional conference defense counsel asked the trial court to instruct the jury that it must consider the defendants' ages in determining whether they acted with the reckless indifference to human life necessary for first degree felony murder. The trial court agreed and instructed the jury to consider whether the defendants were youthful in evaluating whether they acted with reckless indifference to human life under the *Banks/Clark* factors.[7] Neither defense attorney asked the trial court to instruct the jury to consider youth in evaluating whether the defendants had the mental state necessary for implied malice murder.

During closing argument, in discussing the *Banks/Clark* factors for felony murder, Reed's attorney stated, "[W]as the defendant youthful? Youthful in California can include anybody under 25. People have impaired ability to make good decisions up until that age. California has adopted that."

In discussing aiding and abetting robbery, Wiggins's attorney argued, "I think it's asking a lot to ask Mr. Wiggins, four years younger than Mr. Reed, and doesn't really know Mr. Reed, riding in the back of Mr. Reed's car with Mr. Reed's close, close friend also in the front seat, it's asking a lot for him to . . . [s]ay, wait a minute. I didn't sign up for this. What are you doing driving that car and hurting that guy? I don't want any part of this. I don't want this laptop. Let me out."

In rebuttal, the prosecutor argued, "And a couple of other things the defense mentioned, both sides mentioned in their closing, that was the idea of age. And age can play a role in your determinations of whether or not

[7] *People v. Banks* (2015) 61 Cal.4th 788; *People v. Clark* (2016) 63 Cal.4th 522.

12

somebody acted with reckless indifference to human life or was a major participant in the crime. There's no question both these men are young. Mr. Wiggins is considerably younger than Mr. Reed by all accounts, but there's no evidence that the youth of these defendants impaired their ability to think rationally on this day or make informed decisions. If anything, we see a high level of planning and a high level of coordination before, during and . . . after the crime in question."

In addition to instructing the jury on implied malice murder using CALCRIM No. 520, the court also instructed on the mental state necessary for second degree implied malice murder using CALCRIM No. 580—the pattern instruction on involuntary manslaughter: "The difference between other homicide offenses and involuntary manslaughter depends on whether the person was aware of the risk that his actions created and consciously disregarded that risk. An unlawful killing caused by a willful act done with full knowledge and awareness that the person is endangering the life of another, and done in conscious disregard of that risk, is murder."

Using CALCRIM No. 223, the court instructed the jury on direct and circumstantial evidence in relevant part: "Both direct and circumstantial evidence are acceptable types of evidence to prove or disprove the elements of a charge, *including intent and mental state* and acts necessary to a conviction, and neither is necessarily more reliable than the other. Neither is entitled to any greater weight than the other. *You must decide whether a fact in issue has been proved based on all the evidence.*" (Italics added.)

2. *Analysis*

Reed has cited no authority—nor have we discovered any—requiring a trial court to sua sponte instruct the jury to consider a defendant's age in determining whether he acted with conscious disregard for human life as

required for implied malice murder.[8]  The cases Reed cites to support his argument that the jury "must consider a defendant's youth when determining whether he had the subjective mens rea for implied malice murder" all arose in the context of proceedings challenging the sufficiency of the evidence on a felony-murder special circumstance finding or in petitions for resentencing under section 1172.6.  None of them address claims of jury instructional error.  (See *Pittman*, *supra*, 96 Cal.App.5th at pp. 403–404, 416 [denial of section 1172.6 petition reversed and remanded for trial court to consider petitioner's youth as a factor in assessing whether he acted with implied malice[9]]; *People v. Jones* (2022) 86 Cal.App.5th 1076, 1093 [denial of

_____

[8] CALCRIM No. 520 now includes a "Related Issues" section discussing "Youth as a Factor for Implied Malice."  This section describes *People v. Pittman* (2023) 96 Cal.App.5th 400, 416–418 (*Pittman*), which "considered the role of youth—commonly defined as 25 years of age or younger—in analyzing a resentencing petition under . . . section 1172.6 where the defendant was 21 years old at the time of the offense.  The court concluded that youth was a relevant factor and remanded the case for the trial court to consider whether the defendant's youth had impacted his ability to form the requisite mental state for implied malice second degree murder.  [Citation.]  In reaching this conclusion, *Pittman* relied on a series of cases that found youth relevant to reckless indifference determination in the felony murder context."

[9] *Pittman*, *supra*, 96 Cal.App.5th 400, upon which Reed relies does not compel a contrary conclusion.  In that case, 21-year-old Pittman attended a house party with 16- and 17-year-old cohorts, and all three were "drunk." (*Id*. at pp. 403-404.)  One of the minors suggested robbing a nearby liquor store, and Pittman left to obtain a gun.  (*Ibid*.)  When Pittman went to retrieve the gun, he saw a person in a truck parked in front of his house "shooting up dope" with a prostitute.  (*Ibid*.)  Pittman returned to the party and said to his cohorts they should " 'go whip [the person's] ass.' " (*Ibid*.)  The court found there was no plan to rob or kill the victim.  (*Ibid*.)  Pittman took a chisel from a bucket on a neighbor's porch and handed one each to his cohorts, one of whom stabbed the victim with it.  (*Ibid*.)  A jury found Pittman guilty of second degree murder.  (*Id*. at p. 409.)  Our colleagues in Division Four concluded the trial court's failure to consider Pittman's youth at his

14

resentencing petition reversed for trial court to consider petitioner's youth and maturity level at time of crime as part of determining whether he was a major participant who acted with reckless indifference to human life]; *People v. Ramirez* (2021) 71 Cal.App.5th 970, 987 [same]; *In re Moore* (2021) 68 Cal.App.5th 434, 451–455 [habeas petition granted finding evidence of petitioner's youth relevant to whether he acted with reckless indifference to human life for felony-murder purposes]; *People v. Harris* (2021) 60 Cal.App.5th 939, 960 [denial of resentencing petition in felony-murder case reversed where trial court failed to hold evidentiary hearing; also given petitioner's "youth at the time of the crime, particularly in light of subsequent case law's recognition of the science relating to adolescent brain development [citations], it is far from clear that [he] was actually aware 'of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants' "].)

In passing, Reed asserts the error in failing to direct the jury to consider his age in determining whether he acted with conscious disregard violated his federal due process right. This argument is without merit. First, none of the cases he cites deal with due process considerations for instructional error at a jury trial. (See *Hicks v. Oklahoma* (1980) 447 U.S. 343, 347 [failure to instruct on statutory sentence for habitual offender]; *Olim v. Wakinekona* (1983) 461 U.S. 238, 240 [inmate's interstate prison transfer];

---

section 1172.6 resentencing hearing was not harmless, reasoning that "[i]nferences of immaturity and peer pressure may be drawn" from the circumstances of the case, and the trial evidence indicated Pittman and his cohorts "acted impulsively and under the influence of 'transient rashness,' " with the selection of chisels as weapons seeming spontaneous, and the motive for the crime the "happenstance" that Pittman happened to notice the victim shooting up dope in a truck. (*Id*. at p. 418.)

15

*Kentucky Dept. of Corrections v. Thompson* (1989) 490 U.S. 454, 455– 456 [suspension of inmates' visitation privileges].) Second, as discussed, there was no error. Third, any alleged error did not deprive Reed of a fair trial or otherwise limit his right to present a defense. The jury was aware of Reed's age and those of his cohorts; Reed's attorney argued—albeit in the context of whether Reed acted with reckless indifference for purposes of felony murder—that Reed by reason of his age had an impaired ability to make good decisions. The jury was also instructed to carefully review all of the evidence in reaching its verdict (CALCRIM No. 223), and to read all of the instructions together (CALCRIM No. 200). The instructions as a whole directed the jury to consider all of the evidence in determining whether Reed acted with conscious disregard for human life, including evidence of his youth.

## II. Ineffective Assistance of Counsel

Reed contends his trial counsel rendered ineffective assistance by (1) failing to request a pinpoint instruction on the "high degree of probability" implied malice standard; (2) not objecting to impermissible lay opinion of Officer Moriarty; and (3) failing to impeach Officer Moriarty with his preliminary hearing testimony.

Reed has a heavy burden to establish ineffective assistance of counsel on direct appeal. He must demonstrate "both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates, and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings." (*People v. Cudjo* (1993) 6 Cal.4th 585, 623, citing *Strickland v. Washington* (1984) 466 U.S. 668, 687–696 (*Strickland*).) We conclude Reed has not met his burden on appeal.

16

**A.** *Defense Counsel Did Not Render Deficient Performance By Not Requesting a Pinpoint Instruction on Implied Malice*

Reed contends his trial counsel was ineffective for failing to request a pinpoint instruction that implied malice required a "high degree of probability" that death would result. As we have discussed, the jury instructions correctly advised the jury regarding implied malice. "[W]here standard instructions fully and adequately advise the jury upon a particular issue, a pinpoint instruction on that point is properly refused." (*People v. Canizalez* (2011) 197 Cal.App.4th 832, 857.) Accordingly, Reed's trial counsel did not render deficient performance by choosing not to make a request for a pinpoint instruction the court would likely have denied. (*People v. Price* (1991) 1 Cal.4th 324, 387 ["Counsel does not render ineffective assistance by failing to make motions or objections that counsel reasonably determines would be futile"].)

Reed's trial counsel could have tactically opted not to request a pinpoint instruction to avoid the possibility that the trial court might foreclose any argument using the omitted language. As it turned out, Reed's attorney argued the principle embodied by the omitted language during his closing argument. Reed's attorney argued, "[I]t's the natural and probable consequence you do that that somebody could die. *It's not just possible, it's highly likely.*" (Italics added.) In any event, even if the failure to request the pinpoint instruction "fell below an objective standard of reasonableness under prevailing norms" (*People v. Mai* (2013) 57 Cal.4th 986, 1009), Reed has not established prejudice (*Strickland, supra,* 466 U.S. at p. 694).

The evidence at trial established Reed sped away from the scene while Mr. Zeng was hanging precariously out of the open side door of an SUV, and that he did not stop when Mr. Zeng was ejected. This conduct was not merely dangerous in a vague, general sense. (See *Reyes, supra,* 14 Cal.5th at p. 989.)

17

Rather, it involved a " 'high probability' " that death would result. (*Knoller*, *supra*, 41 Cal.4th at p. 157.)

Accordingly, we conclude, Reed has failed to establish there is a reasonable probability that had the jury been instructed with the omitted language the result of the proceedings would have been different. (*Strickland*, *supra*, 466 U.S. at p. 694.)

## B. *The Challenged Testimony Was Proper Lay Opinion*

Reed contends his defense counsel rendered ineffective assistance when he failed to object to Officer Moriarty's testimony about the injury to Mr. Zeng's thigh on the grounds it was improper and speculative lay opinion.

### 1. *Additional Background*

Officer Moriarty attended the autopsy and testified over objection that he saw injuries on Mr. Zeng's right thigh that looked as if they had been caused by a vehicle tire. Counsel for codefendant Wiggins objected that Moriarty's statement of belief was "a statement of expert opinion and he hasn't been qualified." Reed's attorney objected that "[t]his is something actually for the jury to decide." The prosecutor countered that the statement was proper lay opinion under Evidence Code section 800, and the trial court agreed. Neither defense attorney made further objections to this testimony.

### 2. *Analysis*

Reed contends his trial counsel rendered ineffective assistance of counsel by not objecting to Officer Moriarty's testimony on the grounds that it "was impermissible lay opinion and too speculative to be admissible."

"A lay witness may offer opinion testimony if it is rationally based on the witness's perception and helpful to a clear understanding of the witness's testimony." (*People v. Leon* (2015) 61 Cal.4th 569, 601; see Evid. Code, § 800.) " ' "By contrast, when a lay witness offers an opinion that goes beyond

18

the facts the witness personally observed, it is held inadmissible." ' " (*People v. Dalton* (2019) 7 Cal.5th 166, 231.) Here, Moriarty's opinion that the victim's thigh had made contact with a tire from the vehicle was based on his personal observation at the autopsy. The look of a tire mark is not a matter beyond common experience. (See, e.g., *People v. Phillips* (2022) 75 Cal.App.5th 643, 684–685 [identification of substance on fabric as blood not matter beyond common experience]; but see *People v. Chapple* (2006) 138 Cal.App.4th 540, 547–549 [whether item was prohibited body armor not appropriate for lay opinion].) Officer Moriarty's testimony, based on his personal observation, was not improper lay witness opinion. (See *People v. Leon, supra*, 61 Cal.4th at p. 601) Because the trial court's evidentiary ruling was correct, defense counsel was not deficient for failing to lodge a further objection. (See *People v. Price, supra*, 1 Cal.4th at p. 387.)

**C.** ***Failure to Impeach Officer Moriarty With His Preliminary Hearing Testimony Did Not Constitute Deficient Performance***

In a related claim, Reed contends his trial counsel was ineffective by failing to impeach Officer Moriarty with his preliminary hearing testimony. We are unpersuaded.

1. *Additional Background*

At the preliminary hearing, Officer Moriarty testified that he attended the autopsy and "observed multiple injuries," including "some bruising on . . . the inner portion of his upper right thigh that appeared consistent with a tire tread mark." Moriarty also testified that he had reviewed surveillance footage from inside and outside of the Starbucks.

On cross-examination at the preliminary hearing, counsel for codefendant Wiggins asked Moriarty, "You mentioned on direct examination that when you attended the autopsy, you saw multiple injuries to Mr. Zeng,

19

correct?" Moriarty said, "Yes." Wiggins's attorney continued, "And that one of those was . . . you thought was consistent with tire tread?" Moriarty responded, "Yes." When Wiggins's attorney asked, "Now, do you know that that was tire tread that caused the injury?" Moriarty said, "No, I don't." However, when asked, "Do you have any training in identifying the cause of the visible injuries to the human body?" Moriarty said, "Yes." Moriarty stated he "attended a two-week homicide school where they reviewed different types of injuries and how they can be caused." Moriarty explained the basis for his opinion, stating, "[J]ust the size, shape and pattern of the bruising. It looked like it could be consistent with a tire going over someone's leg." Wiggins's attorney then asked, "So it could be?" Moriarty said, "Yes."

Wiggins's attorney then asked, "Now, did you find any evidence on Mr. Zeng's clothing, for example, the pants, that was consistent with tire tread?" Moriarty said, "No." When asked whether he saw "any evidence on the [surveillance] video that the black BMW had actually run over Mr. Zeng's leg," Moriarty said, "I couldn't tell, no."

At trial, Moriarty reiterated his opinion that the injuries to Mr. Zeng's inner thigh "appeared consistent with contact with the tire of a vehicle." Neither Reed's nor Wiggins's attorney cross-examined Moriarty on this point.

2. *Analysis*

Reed contends his trial counsel failed to effectively cross-examine Officer Moriarty by failing to impeach him with his prior testimony that he could not tell if the vehicle had run over Mr. Zeng's leg. Courts addressing ineffective assistance of counsel claims rarely second-guess trial counsel's cross-examination tactics. (*People v. Ervin* (2000) 22 Cal.4th 48, 94.) Neither Reed nor our review of the record has given us any reason to do so here.

20

Reed's trial counsel could have had at least two plausible tactical reasons for electing not to confront Officer Moriarty with his preliminary hearing testimony. First, Moriarty's preliminary hearing testimony provides information that was unfavorable to Reed. Moriarty testified he was trained to identify different types of injuries, and that he based his opinion on the "size, shape and pattern" of the injuries. After Moriarty stated, "It looked like it could be consistent with a tire going over someone's leg," Wiggins's attorney echoed, "[s]o it could be?" Reed's trial counsel could reasonably have concluded those portions of the cross-examination would have been admitted at trial under the rule of completeness and strengthened the weight of Moriarty's trial testimony. (Evid. Code, § 356; *People v. Vines* (2011) 51 Cal.4th 830, 861, overruled on another ground in *People v. Hardy* (2018) 5 Cal.5th 56, 104 [" ' "The purpose of [Evidence Code section 356] is to prevent the use of selected aspects of a conversation, act, declaration, or writing, so as to create a misleading impression on the subjects addressed" ' "].)

Second, Officer Moriarty's trial testimony did not entirely contradict his preliminary hearing testimony. At both proceedings, Moriarty testified he observed injuries to Mr. Zeng's thigh that were consistent with coming into contact with a tire. To the extent his testimony could be deemed contradictory, it was in the context of his statements at the preliminary hearing about Mr. Zeng's clothing and the surveillance footage not indicating the vehicle ran over Mr. Zeng's leg. Officer Moriarty was not asked these questions at trial.

As with his other claims of ineffective assistance of counsel, Reed has not met his burden on appeal.

21

## III. Cumulative Error

Reed argues the cumulative effect of the asserted errors of his defense attorney and the trial court requires reversal of his convictions. We disagree.

"Cumulative error is present when the combined effect of the . . . errors is prejudicial or harmful to the defendant." (*People v. Capers* (2019) 7 Cal.5th 989, 1017.) We have not found any error to aggregate. (See *People v. Bolin* (1998) 18 Cal.4th 297, 335 [rejecting defendant's contention that "even if harmless individually, the cumulative effect of the trial errors mandates reversal," because "we have rejected all of his claims, we perforce reject this contention as well"].)

## IV. Sentencing

Reed argues the trial court abused its discretion by "failing to consider [his] traumatic upbringing and age" in denying Reed's s *Romero* motion. Alternatively, he argues he received ineffective assistance of counsel because his attorney did not argue these issues at the time of sentencing. We find no error.

## A.     *Additional Background*

As we have noted, Reed was 22 years old when he committed the charged offenses. Following the jury verdicts convicting him of second degree murder and robbery, Reed admitted he had been convicted of second degree robbery on November 22, 2017, and admitted this prior conviction was a strike.

### 1.     *Reed's Letter to the Court*

In advance of sentencing, Reed wrote a letter to the court. He reported that his mother was a drug addict. His father was not present until Reed was five. He woke up "in the middle of the night due to rats running across [his] feet." His grandmother served as his mother until she was "kidnapped,

22

tortured, and murdered." Reed felt neglected and foraged for food in a dumpster.

Reed stated that he began living with his father and his father's girlfriend, who became like a mother to him. Reed lived with his father and his girlfriend on the weekends and eventually moved to San Francisco to stay with them full time so he could attend school.

Reed indicated his home life in San Francisco was much better than it was in Oakland, but they lived in a "dangerous and drug infested neighborhood." Reed described his father as "an all around criminal" who was in and out of Reed's life, and "almost always very angry and abusive." Reed said his father's girlfriend "treated [him] as if she gave birth to" him, "encouraged [him] to be better in life," urged him to use his basketball skills as his "ticket out," and "told [him] to focus in school."

Reed wrote that he "stayed on the right track" until he was 12 years old and witnessed the shooting murder of a friend. He described himself as "eventually . . . becoming a product of [his] environment" and at 24 years old had "lost over ten friends and family members due to gun violence." Reed said he was "not a dangerous person," but that he was "traumatized beyond repair."

2.    *Romero Motion and Defense Sentencing Memorandum*

Defense counsel submitted a comprehensive sentencing memorandum and request to strike Reed's prior strike conviction under *Romero* and section 1385. Counsel led off by urging the court "to consider . . . the underlying intent of the law, [Reed's] youth at both the time of this offense and the prior offense, and the particulars of his background, character and prospects."

Counsel noted that all of the originally charged defendants were " 'youthful offenders' " when the offense in this case was committed: Reed

23

was 22 years old at the time.  And under California law, counsel urged, a youthful offender is "more inclined to be impulsive, to misapprehend risk, and to be less able to anticipate the consequences of their actions."

Under the heading "Mr. Reed's Background" counsel reiterated over multiple single-space pages the information in Reed's letter, describing his childhood, his fractured family, and the events of his childhood and young adult years.  Counsel also described an interview with a therapist when Reed was 18 years old, during which Reed wished he could "start over with everything, starting at age five."

Under the heading "Mr. Reed's Age and His Age at the Time of the Prior Conviction" counsel reiterated that at the time of the offenses, Reed was "well-within California's definition of a youthful offender."  Counsel continued, "In many ways, Mr. Reed seems older than his years, in that he has had to fend for himself much longer than most people his age have.  That, of course, sprung from a lack of related, responsible adults in his life.  He has had little guidance, apart from Ms. Chaney, and has not had appropriate role models in his own family.  His intelligence is apparent, but it has not been directed towards worthwhile, attainable pursuits."  Counsel argued Reed's "ability to contribute outside a prison should not be delayed thirty years."  Counsel urged that a 15-years-to-life sentence "recognize[d] the seriousness of the offense while granting him the opportunity . . . of becoming a contributing adult."

3.    *Probation Report*

The probation report noted Reed was 24 years old at the time of sentencing.  The report showed that in addition to the present offenses, Reed had prior convictions for a 2013 robbery when he was a juvenile, a 2017 robbery when he was 20 years old, and receiving stolen property in Daly City

24

in 2019.  The report stated that immediately after the Starbucks robbery, Reed, Lee, and Wiggins sold Mr. Zeng's stolen laptop and split the proceeds.

Regarding Reed's upbringing, the probation report stated: Reed "was reared in the home of his mother until the age of 7.  Because of the mother's addiction to cocaine, [Reed] was left in the home with no food, no clothing, no educational support, and no nurturing.  [Reed's] father and his wife, subsequently assumed responsibility for [Reed].  In the father's care [Reed] was well provided for."  The probation report noted Reed's father "is not known to formal probation, but, according to [Reed], is currently in custody facing murder charges."

The probation report noted Reed earned his high school diploma while in custody in San Francisco County in 2017.  He had never held employment as an adult, and relied on family members for support.  Reed reported no substance use beyond marijuana, which he used daily and has been using since the age of 12.

As to the present offenses, the probation report identified numerous circumstances in aggravation under California Rules of Court,[10] rule 4.421: (1) the crime involved great violence disclosing a high degree of cruelty, viciousness or callousness; (2) the manner in which the crime was carried out indicates planning; (3) Reed engaged in violent conduct indicating a serious danger to society; (4) his prior adult and juvenile convictions were numerous and of increasing seriousness; (5) he had served one prior prison term for his prior robbery conviction; (6) he was on parole when he committed the present offenses; and (7) his prior performance on parole was unsatisfactory.  The

---

[10] All further refences to rules are to the California Rules of Court.

only factor in mitigation was that Reed "voluntarily acknowledged wrongdoing prior to arrest or at an early stage of the criminal process."

4. *Prosecutor's Sentencing Memorandum*

The prosecutor filed a sentencing memorandum, urging the trial court to, among other things, double Reed's sentences for both the murder and robbery counts based on his prior strike conviction "from 2017."  The prosecutor argued Reed was not an extraordinary individual falling outside the spirit of the "Three Strikes" law.  Rather, Reed was "undeterred by previous arrests and convictions and remains a serious public safety risk." The prosecutor noted that including the present conviction, Reed had been convicted of three violent offenses since 2013, and that Reed had been convicted of robbery on three separate occasions.  The prosecutor wrote, "despite being convicted and sentenced twice before, [Reed] continues to engage in the same conduct."

5. *Sentencing Hearing and Trial Court Ruling*

At the March 21, 2022 sentencing hearing, the trial court stated it had read and considered the 11-page probation report (including the two-page confidential information document), the prosecutor's 15-page sentencing memorandum (including 10 victim impact statements), the 10-page (single spaced) sentencing memorandum from Reed's counsel, and Reed's 9-page letter to the court.[11]  The court stated it had heard the statements from Mr. Zeng's family and friends on the original date that was set for the sentencing hearing, and that it had the opportunity to listen and observe every witness and to view all the evidence presented at trial.

---

[11] The reporter's transcript for the hearing is nearly 40 pages long.

Reed's attorney argued for a mitigated sentence, comparing Reed's sentence to that of Lee and Wiggins and asking the court to sentence Reed "to the low range" "because of the role that happenstance played here."[12] Reed's attorney maintained while "absolutely a person anticipates that somebody will try to keep their possessions," "[w]e don't anticipate that somebody will leap into a car poised to leave right away." He urged the court to strike Reed's prior strike conviction for purposes of sentencing "and give him the low end of the sentence range."

The deputy district attorney emphasized Reed's criminal history as set out in the trial prosecutor's sentencing memorandum, arguing that "simply eras[ing] the conduct that preceded" the present offenses "would be a travesty."

As to count 1, the court struck the five-year prior serious felony conviction enhancement in the interest of justice and found the 30-years-to-life term was "appropriate, substantial, sufficient and adequately addresse[d] the crimes in this case and the conduct of [Reed] that endangered public safety." On count 2, the robbery, the court imposed the midterm of three years, stayed pursuant to section 654, since the murder and the robbery "were committed in a single act when the defendant placed his foot on the accelerator of the BMW, robbing the victim of his laptop, and causing his death in a single act." The court noted that notwithstanding the stay of the robbery conviction, the court could still double the term based on the defendant's qualifying strike prior. But it did not, "pursuant to section 1385 and because the term of 30 years to life is appropriate, substantial and

---

[12] Defense counsel noted that for their participation, codefendants Lee and Wiggins respectively received 10-year and 12-year prison sentences.

sufficient to address the criminal conduct in this case." For the same reasons, the court imposed and stayed a three-year term for the great bodily injury enhancement under section 12022.7, subdivision (a).

The court acknowledged the *Romero* inquiry required it "to consider whether . . . in light of the nature and the circumstances of [Reed's] present felonies and prior serious or violent convictions, and the particulars of his background, character and prospects, [Reed] may be deemed outside of the three-strike scheme in whole or in part," but did "not find this to be the case here." Rather, the court found Reed's "escalating, dangerous criminal conduct does not place him outside of the spirit of the three-strikes scheme. To the contrary. His continued commitment to a livelihood funded by theft and violence endangers public safety." Reed's "escalating recidivist conduct persists and has been undeterred by previous arrests, convictions, state prison commitments, or being on parole."

The court further stated, "Although it is very clear to this court that [Reed] did not go out on that day intending to commit a murder or even a robbery, his conduct and history shows a dangerous and ready willingness to escalate to violence and subordination of the interests, safety and even lives of others if his criminal activities are jeopardized."

The court stated it also considered the "2022 amendments to Penal Code section 1385(c)(1) and the additional factors set forth in 1385 subpart (3) sections (A) through (I)."[13]

---

[13] The court was apparently referring to mitigating factors which included "(D) The current offense is connected to mental illness. [¶] (E) The current offense is connected to prior victimization or childhood trauma. [¶] . . . [¶] (G) The defendant was a juvenile when they committed the current offense or any prior juvenile adjudication that triggers the enhancement or enhancements applied in this case." (Former § 1385, subd. (c)(2); see Stats.

28

The court discussed at length whether there were aggravating and mitigating circumstances, enumerating the specific rules of court at issue. Discussing the circumstances in aggravation, the court found the crime in this case involved great violence, great bodily harm, and acts displaying a high degree of callousness. As the court continued, "Reed's decision to accelerate a high-performance [SUV] down an unusually narrow street with cars parked on both sides, while Mr. Zeng hung precariously in the backseat of the car, coupled with his failure to stop after the victim was propelled from the car which, from testimony that was received in this case, occurred with great force and was very loud, demonstrates a complete disregard and subordination of the value of Mr. Zeng's life to the goal of completing the robbery and escaping with a laptop." The court went on that "according to comments from the co-participants and the probation officer's report, the court learned that defendants sold the laptop at . . . a BART station in San Francisco on that same day and split the proceeds. To have the presence of mind to conduct a sale of stolen property shortly after such a devastating event demonstrates a high degree of callousness and disregard for the enormous harm that was done to another person. Even if they didn't know that the victim died, the testimony at trial about the great force and sound of

2021, ch. 721 § 1, eff. Jan. 1, 2022.) The current version of section 1385 includes these same mitigating factors in subdivision (c)(2); there is no subdivision (c)(3). (Stats. 2023, ch. 131 § 160, eff. Jan. 1, 2024.) Although it is now "well established" that section 1385, subdivision (c) applies to a sentence "enhancement," but not to a sentence derived from the alternative sentencing scheme of the Three Strikes law (*People v. Dowdy* (2024) 107 Cal.App.5th 1, 9), the trial court's consideration of these mitigating factors suggests it thoroughly considered whether to grant Reed's *Romero* motion.

the impact when the victim fell from the car would have informed all of [its] occupants . . . that grave and great bodily injury had occurred."

The court further found in aggravation that Reed "induced others to participate in the commission of the crime and occupied a position of leadership or dominance of the other participants in its commission." The court found Reed was "the initiator and leader of the plan" who enlisted Lee, got the car, picked up and transported the coparticipants from Stockton and San Francisco to commit the crime, and chose and drove them to the site of the crime.

The court found the manner in which the crime was committed indicated planning, sophistication or professionalism, explaining in detail the facts leading up to the crime in the days before. As to the crime itself, the court found that Reed "recircled the block and positioned his car so that he could see the plan play out and be in a position to flee."

As to the factors in aggravation relating to Reed himself, the court enumerated many.[14] (Rule 4.421 (a) & (b).) The court summarized the facts of Reed's prior strike offense, stemming from an October 11, 2017 robbery[15] as follows: "The victim in that case was robbed at gunpoint by two unknown

---

[14] The court found the following aggravating factors under rule 4.421: (1) the crime involved great violence disclosing a high degree of cruelty, viciousness or callousness; (2) the manner in which the crime was carried out indicates planning; (3) Reed engaged in violent conduct indicating a serious danger to society; (4) Reed's prior adult and juvenile convictions were numerous and of increasing seriousness; (5) Reed had served one prior prison term for his prior robbery conviction; (6) Reed was on parole when he committed the present offenses; and (7) Reed's prior performance on parole was unsatisfactory.

[15] The court derived the facts of Reed's prior conviction from the People's motions in limine.

suspects at an ATM in San Francisco at 6:50 p.m. After the victim was robbed, the gunmen . . . fled in a car . . . roughly two hours after the robbery . . . police saw that vehicle, at that time Mr. Reed was the sole occupant . . . . [¶] When police surrounded the car and ordered Mr. Reed to surrender, Mr. Reed accelerated the car towards the officers, almost hitting three officers. He then accelerated through an intersection and slammed into a patrol car and a parked vehicle." Reed "exited the car and ran through the street, jumped fences in a residential area and attempted to hide in a backyard before he was taken into custody by police. Inside the suspect's car that [Reed] was driving was the property of the victim who had originally been robbed at the ATM. Also in that car were two handguns on the floorboard of the driver's seat."

The court found no circumstances in mitigation in relation to the crimes or Reed. The court observed, "The factors in this present case show the same reckless, life-threatening conduct, indicating a mindset to commit criminal acts and avoid arrest, subordinating or even ignoring serious injury or death that could be caused to others as a result." The court found the 30-years-to-life sentence was warranted, adding, "There's no support in this record to point to why, in the interest of justice, [Reed] should receive a lesser sentence under *Romero* or 1385."

## B.  *Applicable Law and Standard of Review*

In furtherance of justice, a trial court may strike or dismiss a prior conviction for purposes of sentencing. (§ 1385, subd. (a); *Romero, supra*, 13 Cal.4th at p. 504.) When ruling on a *Romero* motion, the court must consider "whether, in light of the nature and circumstances of his present felonies and prior serious and/or violent felony convictions, and the particulars of his background, character, and prospects, the defendant may be deemed outside

31

the scheme's spirit, in whole or in part, and hence should be treated as though he had not previously been convicted of one or more serious and/or violent felonies." (*People v. Williams* (1998) 17 Cal.4th 148, 161.) The court also must consider the defendant's constitutional rights and society's interest in the prosecution of crimes. (*People v. Johnson* (2015) 61 Cal.4th 674, 688–689.)

We review rulings on *Romero* motions under the deferential abuse of discretion standard, which requires a defendant to show the sentencing decision was " ' "irrational or arbitrary." ' " (*People v. Carmony* (2004) 33 Cal.4th 367, 376.) A court abuses its discretion when it is unaware of its discretion to strike, considers impermissible factors, fails to consider relevant factors, or renders a ruling that is arbitrary, capricious or patently absurd under the specific facts of the case. (*Id.* at pp. 376–378; *People v. Avila* (2020) 57 Cal.App.5th 1134, 1140–1141 (*Avila*).) We presume the court considered all relevant factors in the absence of an affirmative record to the contrary. (*People v. Myers* (1999) 69 Cal.App.4th 305, 310.)

### C.  *The Trial Court Did Not Abuse its Discretion*

Reed argues the trial court abused its discretion by "failing to consider [his] traumatic upbringing and age" when it denied his *Romero* motion. We find no such abuse of discretion.

The record reflects the trial court fully "consider[ed] . . . the particulars of [Reed's] background, character and prospects." The court stated at the outset of the hearing that it had read Reed's letter, as well as the comprehensive sentencing memorandum from defense counsel, the prosecutor, and the probation department, all of which discussed his age, childhood, the circumstances of his criminality, and his prospects. While the court did not expressly discuss Reed's age and traumatic childhood at the

32

hearing itself, it was not required to do so. Rather, we presume the court considered all relevant factors in the absence of an affirmative record to the contrary. (*People v. Myers*, *supra*, 69 Cal.App.4th at p. 310.) Nothing in the record affirmatively shows the court failed to consider Reed's age and traumatic childhood. Nor did defense counsel ever suggest that the court had failed to do so. Indeed, defense counsel referred the court to Reed's nine-page letter, which he characterized as Reed "tak[ing] responsibility," "put[ting] things in context," and "explain[ing] quite a bit about his upbringing," and "express[ing] real remorse."

Reed relies on *Avila*, which held that the trial court abused its discretion in denying a *Romero* motion and erred in imposing a sentence that constituted cruel and unusual punishment because it "did not consider factors relevant to the nature and circumstances of Avila's prior strikes;" mistakenly believed that it could not consider that Avila, now middle-aged, had committed the prior strikes when he was under the age of 21; and was unclear how to deal with the remoteness of the strikes, which were 26 and 28 years before the current offenses. (*Avila*, *supra*, 57 Cal.App.5th at pp. 1143–1144.) In *Avila*, the defendant tried to shake down two fruit vendors and destroyed some oranges in an effort to scare the victims into turning over money, while making a veiled reference to his possible affiliation with gangs; for this he was convicted of attempted robbery and attempted extortion. (*Id.* at p. 1139.)

Unlike in *Avila*, nothing in the record here suggests the trial court believed it could not consider Reed's relative youth and upbringing. Further Reed's current offenses—second degree murder and robbery—are hardly comparable to Avila's, and Reed committed the current offenses while on

parole for the prior strike offense, unlike the lengthy gap in Avila's criminal history.

We need not address Reed's alternative argument that if we find trial counsel failed to properly marshal facts in Reed's favor or set forth arguments regarding his youth and background, then counsel's assistance was ineffective. The record reflects that counsel appropriately presented favorable facts and arguments relating to Reed's youth and individual circumstances, but the court was not persuaded.

## V. Corrections to Minutes and Abstract of Judgment

Reed argues, and the Attorney General concedes, errors in the minutes and the abstract of judgment require correction. We agree.

At the sentencing hearing, the court imposed an indeterminate term of 30-years-to-life for the second degree murder conviction (count 1) and a determinate three-year midterm sentence for the second degree robbery conviction (count 2), which the court ordered stayed pursuant to section 654. The court struck the section 667, subdivision (a)(1) enhancement, stating: "The five-year enhancement pursuant to 667 (a)(1) is stricken pursuant to section 1385 in the interest of justice." However, the sentencing minute order does not mention or reflect any action by the court on the five-year prior enhancement.

Where, as here, there is a discrepancy between the court's oral pronouncements and the minute order and/or the abstract of judgment, the court's oral pronouncements control. (*People v. Zackery* (2007) 147 Cal.App.4th 380, 385.) Thus, the sentencing minute order must be corrected to reflect the court struck the five-year enhancement (§ 667, subd. (a)(1)) pursuant to section 1385 in the interest of justice.

34

Additionally, the court initially set the restitution fine at $10,000 but reduced it to $8,000. The clerk's minutes erroneously reflect that the court imposed $10,000 in restitution fines. The abstract of judgment also erroneously reflects a "$100000.00" in restitution (§ 1202.4, subd. (b)) and a corresponding "$100000.00" suspended parole revocation fine (§ 1202.45). Accordingly, the sentencing minute order and the abstract of judgment are ordered to be corrected to reflect the imposition of an $8,000 restitution fine and a corresponding suspended $8,000 parole revocation fine.

Finally, the abstract of judgment erroneously includes both the indeterminate and determinate terms on the same form (Judicial Council Forms, form CR-292.)[16] Box seven on form CR-292 should have been checked to indicate an additional determinate term (form CR-290). We direct the clerk of the superior court to strike the second degree robbery conviction (count 2) from form CR-292 and to check box seven. The clerk is further ordered to prepare an abstract of judgment on form CR-290 as to count 2, indicating the imposition of a three-year midterm stayed pursuant to section 654.

## DISPOSITION

The March 21, 2022 sentencing minute order is hereby ordered to reflect: (1) the five-year enhancement (§ 667, subd. (a)(1)) is stricken in the interest of justice (§ 1385); and (2) imposition of an $8,000 restitution fine (§ 1202.4) and a suspended parole revocation fine of $8,000 (§ 1202.45) pending successful completion of parole.

The clerk of the superior court is directed to correct the abstract of judgment as follows: (1) remove the second degree robbery (§ 211) conviction

---

[16] Further references to forms are to the Judicial Council Forms.

(count 2) from form CR-292; (2) check box seven on form CR-292 indicating the imposition of a determinate term; (3) prepare form CR-290 for the determinate sentence consisting of a three-year midterm sentence, stayed pursuant to section 654, for the second degree robbery (§ 211) conviction (count 2); and (4) prepare a revised form CR-292 to reflect an $8,000 restitution fine (§ 1202.4) and a suspended parole revocation fine of $8,000 (§ 1202.45) pending successful completion of parole.

The clerk of the superior court is further directed to forward the revised form CR-292 and new form CR-290 to the California Department of Corrections and Rehabilitation.

In all other respects the judgment is affirmed.

_____
Miller, J.

WE CONCUR:


_____
Richman, Acting P.J.


_____
Desautels, J.


A164986, *People v. Reed*

37